**In re AM INTERNATIONAL, INC., Debtor.**

**AM INTERNATIONAL, INC., Plaintiff,**

**v.**

**TENNESSEE VALLEY AUTHORITY, Tennessee Data Systems, Inc., James L. Corby, Technical Data Systems, Inc., John Does 1–5 and Commerce Union Bank, Defendants.**

Bankruptcy No. 82B04922.
Adv. No. 383–02002.

United States Bankruptcy Court,
M.D. Tennessee.

Oct. 4, 1985.

James V. Doramus, Doramus, Gideon & Trauger, Nashville, Tenn., for plaintiff.

Marc T. McNamee, Dearborn & Ewing, Nashville, Tenn., for Commerce Union Bank.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

This memorandum and accompanying order will allocate the attorneys' fees and expenses recoverable by the plaintiff for the defendant Commerce Union Bank's ("CUB") violation of the stay. By previous memorandum and order, CUB was assessed costs and attorney's fees for its violation of the automatic stay. *AM International, Inc. v. Tennessee Valley Authority*, 46 B.R. 566 (Bankr.M.D.Tenn. 1985). The debtor's law firm, Doramus, Gideon & Trauger ("DGT") filed an application for fees of $63,684 and expenses totaling $6,430.[1] CUB objected and an evidentiary hearing was held.

### I.

The underlying facts are detailed in the previous opinion. Briefly, AMI manufactured word processing equipment which it sold to Tennessee Data Systems, Inc. ("TDS"). TDS in turn sold the equipment to Tennessee Valley Authority ("TVA"). CUB was a creditor of TDS secured by accounts receivable. AMI and TDS entered into a lockbox agreement whereby payments from TVA to TDS were sent to a lockbox account from which 75% of the funds were disbursed to AMI. CUB consented to this lockbox system. After AMI filed bankruptcy and with knowledge of the filing, CUB diverted AMI's money from the lockbox. AMI was forced to file this ancillary proceeding against CUB to recover the diverted funds. This court held that CUB's diversion of the funds was a blatant act to obtain property of the estate in violation of 11 U.S.C. § 362(a)(3). We awarded attorney's fees for the violation of the stay:

> In this proceeding AMI was completely innocent and had a statutory right to have its assets protected by the bankruptcy stay. Great expense has been incurred in this ancillary proceeding by AMI to recover its property from the bank. AMI's general creditors should not bear the costs of vindicating the rights and recovering the money lost by AMI when CUB violated the stay. Costs of this proceeding, including reasonable attorneys' fees will be assessed against CUB upon appropriate application of AMI and its attorneys.

---

1. AMI's initial request was for $85,289.87. This sum included the fees and expenses of AMI's in-house and Chicago counsel. Those sums were subsequently dropped from the request.

*AM International, Inc. v. Tennessee Valley Authority,* 46 B.R. at 578.

## II.

DGT has submitted lengthy and detailed time records in support of its fee application. CUB submitted into evidence a copy of DGT's time sheets which DGT annotated at CUB's request to reflect the amount of time spent pursuing particular issues identified in the pretrial orders. CUB's Exhibit A to the Attorney Fee Hearing (a summary of CUB's Exhibit A has been attached as Appendix A to this memorandum).

█ CUB first argues that this court should refuse to award attorneys' fees for unrecorded or estimated time. We accept the general proposition that bankruptcy courts refuse to grant attorneys' fees for unrecorded or estimated time. *See In re Meade Land & Development Co., Inc.,* 527 F.2d 280, 283–84 (3d Cir.1975); *In re Garland Corp.,* 8 B.R. 826 (Bankr.D.Mass. 1981); *In re Nation/Ruskin, Inc.,* 22 B.R. 207, 210 (Bankr.E.D.Pa.1982). The basis for this objection appears to be that although DGT carefully and contemporaneously recorded the hours spent and work performed in pursuing this adversary proceeding, they did not contemporaneously allocate the time among the claims and against the various defendants. Allocation was done by DGT after it succeeded in its action against CUB and after this court awarded fees for violation of the stay. CUB argues that the entire application fails because the allocation was not made contemporaneously with the recordation.

The cases cited by CUB are all readily distinguishable. In each of those cases the applicants submitted poorly substantiated requests for fees, from which the courts could not ascertain the nature of services performed. Each court held that in the absence of contemporaneous and detailed records, the applicant could not justify an award of fees.

In the instant application, DGT has in great detail described the services performed in this adversary proceeding. The contemporaneous records supplied by DGT meet this court's standards for fee applications in bankruptcy cases. At the time of provision of services, DGT had no obvious reason to also allocate and record its work by individual defendants or issues. That responsibility arose only upon the awarding of fees and the objections by CUB. DGT has demonstrated the propriety of its allocation through the exhibits and testimony at the evidentiary hearing. James V. Doramus testified on behalf of DGT and explained how the time records and allocation were prepared. He was a highly credible witness and CUB has submitted no proof which would contravene his testimony. If anything, based on Mr. Doramus' testimony, it appears that questionable entries were allocated by DGT in a manner favorable to the bank's position. This court will not penalize the estate or its counsel for failing to do contemporaneously that which it had no reason or obligation to do.

█ CUB next argues that attorneys' fees should not be awarded for violations of the automatic stay which involve unusual or controversial questions of law. There is some support for this position. *See United States on Behalf of I.R.S. v. Norton,* 717 F.2d 767, 775 (3d Cir.1983).[2]

Another line of decisions holds that bankruptcy courts may punish a violation of the stay regardless of the controversial nature of the underlying issue involved. *Borg-Warner Acceptance Corp. v. Hall,* 685 F.2d 1306 (11th Cir.1982); *Matter of Baldwin United Corp.,* 48 B.R. 901 (Bankr.S.D. Ohio 1985); *Matter of Batla,* 12 B.R. 397, 8 B.C.D. (CRR) 26 (Bankr.N.D.Ga.1981); *and see McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192, 69 S.Ct. 497, 500, 93 L.Ed. 599, 604–05 (1949) (Douglas, J.) (injunction under Fair Labor Standards Act). These courts reason that creditors should

---

**2.** CUB also cites *In re Hurricane Elkhorn Coal Corp. II,* 19 B.R. 609, 620, 8 B.C.D. (CRR) 1243 (Bankr.W.D.Ky.1982) in support of its argument. That case was substantially modified on appeal. *In re Hurricane Elkhorn Coal Corp., II,* 32 B.R. 737, 11 B.C.D. (CRR) 13 (D.C.W.D.Ky. 1983) *modifying,* 19 B.R. 609, 8 B.C.D. (CRR) 1243 (Bankr.W.D.Ky.1982).

file first with the bankruptcy court to determine the applicability of the automatic stay and those who act without court authorization do so at their peril. *NLT Computer Services Corp. v. Capital Computer Systems, Inc.*, 755 F.2d 1253 (6th Cir.1985).

This circuit has recently adopted the latter position.[3] *Id.* If CUB had submitted its claims to the bankruptcy court in Illinois, instead of taking matters into its own hands, a great deal of time, effort and needless litigation would have been prevented. If CUB had not surreptitiously seized the debtor's money but had initially submitted the dispute to the bankruptcy court, the need to transfer venue to this court, hire additional counsel, trace the funds which had been diverted by CUB and litigate a variety of other questions would not have arisen.

■ Third, CUB objects to fees for time spent on issues which were resolved against AMI. This contention has received much judicial attention in civil rights cases. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This court has addressed the same argument in the context of dischargeability litigation under 11 U.S.C. § 523(a)(6). *Commerce Union Bank of Sumner Co. v. Watson*, 44 B.R. 183 (Bankr.M.D.Tenn.1984). In *Hensley*, the Supreme Court noted that a plaintiff's claims for relief often involve a common core of facts making it difficult to divide the hours spent in the litigation on a claim by claim basis. *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940, 76 L.Ed.2d at 51. In *Watson*, Chief Judge Paine of this court applied *Hensley* to an application for attorneys' fees pursuant to § 523.[4] Analyzing *Hensley*, the court stated:

As a result, the court held, the trial court cannot view the litigation as a series of discrete claims, but must focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended. Thus, when a plaintiff obtains excellent results, the attorney should receive full compensation. When a plaintiff is unsuccessful on certain claims, the denial of fees is contingent on the finding that these claims are "distinctly different claims," i.e., based on "different facts and legal theories" than the successful claims.

*Watson*, 44 B.R. at 186 (citing *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940, 76 L.Ed.2d at 51).

AMI's claim for tortious interference with contractual relations, although it was resolved on close facts in CUB's favor, involved the same nucleus of operative facts as AMI's other claims, including the claim for violation of the stay. The elements of the tortious interference cause of action are set forth in our prior opinion. *AM International*, 46 B.R. at 575. For purposes of discovery and trial, AMI's counsel had to develop the respective property rights of the parties as part of its proof of violation of the stay and interference with contract. CUB's knowledge of the financial condition, activities and dealings among TVA, TDS and AMI were essential facts to both theories of recovery. CUB's defense to both claims was essentially the same: "We thought it was our collateral and we could do with it as we pleased." The stay violation could not have been proved without preparing the contract and priority issues which underlie CUB's defense of both theories of recovery. Although the tort claim involved the additional requirement of *malicious* intent,

---

**3.** It is not at all obvious that CUB could prevail even in a jurisdiction adopting the contrary legal position. CUB perceived itself to have a lien dispute with the debtor. This is hardly an uncommon position for a bank secured by assets also claimed by a debtor in bankruptcy. Resolution of this underlying question, as demonstrated in this court's prior opinion, did not reveal any unsettled or controversial questions. In fact, the only difficult question presented to this court was whether the plaintiff was also

entitled to treble damages against the bank under Tennessee law.

**4.** In *Hensley*, the Supreme Court was confronted with a civil rights case, but the court noted that its reasoning should apply to any fee request. In *Watson*, this court specifically held that *Hensley* was applicable to a fee request in a bankruptcy case. *Watson*, 44 B.R. at 186 n. 3.

intent and knowledge must be examined and developed by the debtor to properly present a case for violation of the automatic stay. It is impossible to conceive how either cause of action could be developed through discovery and trial without encroaching upon a common core of facts.

■ Fourth, CUB objects to any award of attorneys' fees for time spent litigating AMI's claims against other defendants. This position has merit. *See Kelley v. Metropolitan County Board of Education*, 773 F.2d 677, 684–85 (6th Cir.1985) (en banc). This court is not prepared to state that a debtor may never recover the costs of litigating claims against other parties which may have been occasioned by a violation of the stay by one creditor. In this proceeding, the court is satisfied that fees should not be assessed against CUB for litigation in relation to claims against TVA, TDS and DET not related to the lockbox agreement.

As noted above, DGT has carefully documented and allocated its fee application. In Exhibit A, one column represents "claims against TVA, TDS and DET—not related to lockbox claims (Issues No. 3, 5, 6, 7, 11–14)." The time entries in this column have been reviewed and will be subtracted from DGT's total request.

■ CUB's final contention is that it should not be assessed AMI's attorneys' fees for litigating issues which might have been litigated even if it had not violated the stay. Noting that only 1.75 hours of the time documented by AMI was contemporaneously designated as research regarding the automatic stay, CUB contends that only this time is compensable.

CUB's position is untenable. As demonstrated above AMI's attorneys could not have appropriately developed their stay case against the bank without also developing facts and evidence relevant to other causes of action which could have been dealt with by the bankruptcy court in Illinois had CUB not seized AMI's property in violation of the stay. As a matter of fact, this court finds that AMI's counsel spent many more than 1.75 hours preparing and litigating the stay questions in this proceeding.

CUB's argument is based on speculation as to what would have been litigated and at what expense had the bank acted properly and submitted its dispute with the debtor to the bankruptcy court in Illinois.[5] In an analogous situation, in *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir.1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977), the United States Court of Appeals for the Second Circuit upheld sanctions by a district court which included attorneys' fees for litigating not only the question of the violation of the automatic stay provided under former Bankruptcy Rule 11–44 but also for litigation of an underlying lien priority dispute.

CUB's argument that AMI can recover only that infinitesimal portion of its fees contemporaneously styled "stay research" elevates form over substance and grotesquely distorts the whole purpose for which bankruptcy courts award sanctions for violations of the stay. The automatic stay is one of the most important protections provided to a debtor under the Code. H.R.REP. NO. 595, 95th Cong., 1st Sess. 340–2 (1977); S.REP. NO. 989, 95th Cong., 2d Sess. 49–51 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5835–5837, 6296–6299. CUB's position would effectively deny debtors the protection intended to be provided by the automatic stay. If AMI could only collect attorneys' fees for

---

5. AMI admits that certain matters which were litigated in this proceeding would have been litigated (though more economically) in the course of AMI's bankruptcy in Illinois. Issues 4, 17 and 18 (as set out in the pretrial orders) fit in this category. In preparing the breakdown of attorneys' fees in Exhibit A, Doramus allocated the time expended on these issues. He stated at the hearing that he was generous in attributing time to this column. CUB has offered no proof to the contrary. Accordingly, this time will be subtracted from the total request.

time spent researching § 362 itself then what creditor would not defy the stay as an economically sensible strategy for dealing with debtors in bankruptcy?

A summary of this court's analysis of compensable fees and expenses consistent with this memorandum is attached.

An appropriate order will be entered.

APPENDIX A TO MEMORANDUM

SUMMARY OF CUB'S EXHIBIT A TO THE ATTORNEY FEE HEARING

| Time Period | Attorney | Hours | Col. 1 Claims Against TVA, TDS, & DET–Not Related to Lockbox Claims (Issue Nos. 3, 5, 6, 7, 11–14) | Col. 2 Legal Work Arising Out of AMI Claims Against CUB | Col. 3 Priorities (4, 18) Misrepresentations (17) Additional Work Even if Funds Tendered to Court | Col. 4 Total Compensable Time (Col. 3–Col. 4) |
|---|---|---|---|---|---|---|
| 10/11/83–3/30/84 | JVD[A] | 148.70 | 89.49[B] | 59.21[B] | 3.00 | 56.21 |
| 4/03/84–4/30/84 | JVD | 69.50 | 24.80 | 44.70 | 14.80 | 29.90 |
| 5/02/84–5/31/84 | JVD | 63.25 | 19.375 | 43.875[C] | 15.75 | 28.125 |
|  | BRT | 99.50 | 75.40 | 24.10 | 2.75 | 21.35 |
|  | RLM | 9.00[D] | 4.50 | 4.00 | 0.00 | 4.00 |
| 6/01/84–6/30/84 | JVD | 101.50[E] | 42.75 | 58.75 | 28.50 | 30.25 |
|  | BRT | 6.25 | 4.00 | 2.25 | .50 | 1.75 |
|  | RLM | 17.80[F] | 7.00 | 10.80 | 9.50 | 1.30 |
| 7/02/84–7/30/84 | JVD | 16.25[G] | 7.00 | 9.25 | 0.00 | 9.25 |
|  | BRT | 1.00[H] | 0.00 | 1.00 | 0.00 | 1.00 |
|  | RLM | 12.50[I] | 0.00 | 12.50 | 6.25 | 6.25 |
| 8/01/84–8/31/84 | JVD | 60.25 | 20.50 | 39.75 | 11.60 | 28.15 |
|  | BRT | .75 | .50 | .25 | 0.00 | .25 |
|  | RLM | 21.40 | 14.70 | 6.70 | 1.80 | 4.90 |
| 9/01/84–9/30/84[K] | JVD | 31.00[J] | 1.75 | 29.25 | 3.25 | 26.00 |
|  | BRT | 1.45 | 0.00 | 1.45 | .60 | .85 |
|  | RLM | 40.60 | 0.00 | 40.60 | 28.95 | 11.65 |
| 9/14/84–9/25/84[L] | JVD | 16.50 | 3.00 | 13.50 | 2.735[M] | 10.765 |
| 10/01/84–10/31/84 | JVD | 88.05 | 4.80 | 83.25[N] | 11.843 | 71.407 |
|  | BRT | 24.45 | 0.00 | 24.45[O] | 4.00 | 20.45 |
|  | RLM | 9.60[P] | 0.00 | 9.60 | 0.00 | 9.60 |
| 11/01/84–12/21/84 | JVD | 59.45 | 0.00 | 59.45 | 3.00 | 56.45 |
|  | BRT | 38.20 | 0.00 | 38.20 | .50 | 37.70 |
|  | RLM | 57.00 | 1.00 | 56.00 | 6.00 | 50.00 |
| 01/01/85–[Q] 3/31/85 | JVD | 10.60 | 0.00 | 10.60 | 0.00 | 10.60 |
| TOTALS | JVD | 665.05 | 213.465 | 451.585 | 94.478 | 357.107 |
|  | BRT | 171.60 | 79.90 | 91.70 | 8.35 | 83.35 |
|  | RLM[R] | 39.30 | 11.50 | 27.30 | 15.75 | 11.59 |
|  | RLM | 128.60 | 15.70 | 112.90 | 36.75 | 76.15 |

**A** Attorneys are referred to by their initials: JVD–James V. Doramus; BRT–Byron R. Trauger; RLM–Robert L. Morgan.

**B** Adding up the figures in columns two and three on CUB's Exhibit A yield 92.83 and 59.31 hours respectively. These sums are inconsistent with the total hours spent by JVD. An analysis of the allocations, however, shows that certain time intended to be allocated to CUB was mistakenly allocated in both columns. This amount, 3.34 hours, has been subtracted from the claims column to reflect JVD's intent in allocating this time. An addition error resulted in an extra .2 hours being attributed evenly to the claims column and the legal work column. Accordingly, .10 hours was subtracted from both columns. Finally, .10 hours was not attributed to either column. This amount has been added to the claims column.

**C** One and one quarter hours was mistakenly allocated both to the claims column and the legal work column. It appears the intent was to split the time equally between both columns. Accordingly, .625 hours has been subtracted from each column.

**D** One half hour of this time was not allocated to either the claims column or the legal work column.

**E** This number does not correspond with the 104.75 hours attributed to JVD in the summary provided after the 6/30/84 entry on CUB's Exhibit A. The difference is attributable to 2.75 hours of work which was done on 6/21/84 and not attributed to any attorney. As none of this time was allocated to CUB, it has not been added to any column on this summary. The remaining .50 discrepancy is attributable to time spent by RLM mistakenly added into JVD's total on CUB's Exhibit A.

**F** *See* n. E.

**G** In the summary provided after the 7/30/84 entry on CUB's exhibit A, this number is 19.75. The difference is attributable to one hour of time spent by BRT, and 2.50 hours spent by RLM.

**H** *See* n. G.

**I** *See* n. G.

**J** This number does not include the 16.50 hours spent by JVD between 9/14/84 and 9/25/84. That time was not included in CUB's Exhibit A.

**K** CUB's Exhibit 1 shows 1.60 hours less in partner time for the month of September than was requested by DGT in their fee and expense summary to Exhibit 1. CUB's Exhibit A shows 1.20 hours spent by RLM more than is requested in DGT's fee and expense summary. Additionally, .40 hours spent on 9/27/84 is not attributable to any attorney. Fees for that time will be awarded to DGT at the lowest rate. Accordingly, that time has been included in RLM's time.

**L** Time spent by JVD between 9/14/84 and 9/25/84 was not included in CUB's Exhibit A. However it was included in Exhibit 1.

**M** Exhibit 1 did not allocate time to various issues to the extent of CUB's Exhibit 1. This number was arrived at by determining the overall percentage of time attributable to CUB which was expended on the priorities and misrepresentation issues and then mutiplying the amount of time in the legal work column for this period by that percentage.

**N** One and two tenths hours spent by JVD on 10/19/84 was not allocated on CUB's Exhibit A. Exhibit 1 shows that this time was all attributed to CUB and has been included in this column. A percentage of that time has also been subtracted from the priorities and misrepresentation column.

**O** CUB's Exhibit A shows 2.75 hours spent on 10/19/84 attributable to this column. The actual number must have been 2.25 hours to make this column correspond with the hours column.

**P** One and one half hours of time which was spent on 10/23/84 is not attributable to any attorney. Fees for this time shall be awarded at the lowest rate. Accordingly, they have been added in the RLM column.

**Q** The hours spent by JVD from 1/01/85–3/31/85 were devoted to preparation and presentation of this fee applicaton. The United States Court of Appeals for the Ninth Circuit has recently held that such time is compensable. *In re Nucorp Energy, Inc.* 764 F.2d 655, 13 B.C.D. (CRR) 435 (9th Cir. 1985). The reasoning in *Nucorp* supports the decision to include compensation for this time in the sanctions against CUB.

**R** For the period 10/01/83 to 7/31/84 DGT was charging $25 an hour for RLM's time. From 8/1/84 to 3/31/85 the applicable rate for RLM's time was $75 an hour. Accordingly, these two periods have been set out separately.

### APPENDIX B TO MEMORANDUM

#### SANCTIONS

| ATTORNEY | HOURS | RATE PER HOUR | | TOTAL FEE AWARD |
|----------|-------|---------------|---|-----------------|
| JVD | 357.107 | $100 | | $35,710.70 |
| BRT | 83.35 | 100 | | 8,335.00 |
| RLM | 11.59 | 25 | | 289.75 |
| RLM | 76.15 | 75 | | 5,711.25 |
| | | | TOTAL FEES | 50,046.70 |
| | | | EXPENSES | 3,381.08 **S** |
| | | | TOTAL AWARD | $53,427.78 |

**S** The expense documentation submitted by DGT has been carefully examined. It appears to this court that the expenses incurred fairly allocate in approximately the same percentages as the charges for attorneys' fees. This expense figure has been determined by applying the percentage of compensable time of the total hours expended to the total of the expenses requested by DGT.

CUB has specifically objected to DGT expenses for the deposition of TVA employees. Those depositions played a part in tracing funds and in preparing both AMI's case against CUB and AMI's response to CUB's defenses. AMI has carried its burden of proof on this issue.